UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE DAVIS,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>RAMA CAPITAL PARTNERS, LLC, et al.,<br><br>　　　　Defendants. | Case No. 23-cv-04969-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**<br><br>Docket No. 6 |

　　　　Plaintiff Stephanie Davis has filed a foreclosure-related suit against more than a dozen Defendants, both companies and affiliated individuals. In the operative first amended complaint ("FAC"), she asserts a number of state claims (*e.g.*, violation of the Homeowner Bill of Rights ("HBOR"), fraud, and breach of contract) and two federal claims (violation of Regulations Z and C). Now pending before the Court is Defendants' motion to dismiss the FAC. The Court finds this matter suitable for disposition on the papers. The Court hereby **GRANTS** the motion to dismiss but gives Ms. Davis leave to amend.

**I.　　FACTUAL & PROCEDURAL BACKGROUND**

A.　　FAC

　　　　Ms. Davis's complaint is not a model of clarity. However, based on the Court's review, the main allegations in the FAC (as further explicated by her motion for a TRO which was filed in October 2023, *see* Docket No. 11 (TRO motion)) are as follows.

　　　　One June 28, 2022, Ms. Davis entered into a "purchase money agreement" with Athas Capital Group, Inc. ("ACG") with respect to certain real property located in San Leandro. *See* FAC ¶ 4. The deed of trust reflects that the loan amount was $825,000. *See* RJN, Ex. 1 (deed of

trust).

At the time she borrowed the money, ACG did not advise her that it was going to be going out of business soon (*i.e.*, dissolving). *See* FAC ¶ 5; *see also* TRO Mot. at 6 (arguing that ACG "never told its prospective borrowers that they are dissolving the corporation, giving a prospective borrower the option to decide if they wanted to engage in business with a closing company and if they wanted their loan sold after they closed escrow to defendant RAMA before the loan application had processed") (emphasis omitted). In fact, at the time she took out the loan, ACG represented that, within 30 days, she would be able to refinance her mortgage with a lower interest rate. *See* FAC ¶ 6. (In her motion for a TRO, P claims that Ds are engaged in a sham business – "opening, temporarily operating, feeding their pipeline full of distressed homeowners, terminating, dissolving, and then starting the entire process all by creating new businesses." TRO Mot. at 2.)

Nor did ACG advise Ms. Davis that it would be "selling its loans for debt servicing to Defendant Rama Capital Partners, LLC," a company that that "operated by the same persons that owned ACG, but under . . . disguise as "AFK HOLDINGS, INC., COSAINT INCORPORATED, [and] EMS FUND 1, LLC which is truly EMS FUND II, LLC." FAC ¶ 9; *see also* FAC ¶ 5.

It appears that MERS assigned the deed of trust from ACG to The Rama Fund, LLC in or about April 20, 2023.[1] *See* TRO Mot., Ex. N (assignment).

On or about June 2, 2023, a notice of default was issued to Ms. Davis. The notice stated that, at that time, Ms. Davis was behind in payments in the amount of more than $65,000. *See* TRO Mot., Ex. L (notice of default).

B.  Order re TRO

On October 10, 2023, the Court issued a TRO enjoining the sale of the real property at issue for a period of time. *See* Docket No. 21 (order). The Court noted that a number of Ms. Davis's claims appeared weak on the merits. However, at the hearing on the motion, Ms. Davis had articulated, in essence, a new fraud claim not clearly stated in the FAC. In essence, Ms. Davis asserted that

---

[1] The Rama Fund, LLC is not the defendant who has been sued. Ms. Davis has named a different entity using the name Rama, though the entities may be related in some fashion.

> that she was initially promised an interest rate of 8.75% . . . but that, when she went to sign the loan, the interest rate was significantly higher – *i.e.*, 10.875%. She further alleged that, when she brought this to the attention of Defendants, they essentially promised that they would fix the problem by refinancing her loan "in house" at the lower rate so long as she signed the loan that day.

Docket No. 21 (Order at 20). It was because of this new claim (along with the balance of hardships tipping sharply in Ms. Davis's favor) that the Court issued the TRO.

C.  Order re Preliminary Injunction

On November 17, 2023, the Court issued an order denying Ms. Davis a preliminary injunction. The order focused on the new (unpled) fraud claim. The Court found that Ms. Davis had failed to establish a likelihood of success on the merits of this fraud claim because there was no evidence that Ms. Davis was given a lock on the 8.75% interest rate. *See* Docket No. 40 (Order at 4). "Furthermore, the evidence indicate[d] that Ms. Davis was subsequently given a higher interest rate because there was a delay in getting information to Defendants." Docket No. 40 (Order at 5). "In addition, the evidence suggest[ed] that the higher rate was not sprung on Ms. Davis the day of loan-document signing (June 28, 2022)." Docket No. 40 (Order at 5). Finally, the Court noted that it had given "Ms. Davis an opportunity to provide evidence supporting her claim that she contacted Defendants, shortly after the loan-document signing to follow-up on the alleged promise to refinance, [but] she did not provide any evidence to support that claim." Docket No. 40 (Order at 6).

The Court thus denied the motion for a preliminary injunction and noted that the TRO previously issued had expired. *See* Docket No. 40 (Order at 6).

D.  Motion to Dismiss

Because the Court denied the motion for a preliminary injunction, it then turned to Defendants' motion to dismiss which had been filed shortly before Ms. Davis had moved for a TRO. Ms. Davis had failed to file an opposition to the motion to dismiss. The Court therefore issued an order instructing Ms. Davis to show cause as to why her case should not be dismissed without prejudice based on her failure to oppose and/or failure to prosecute her case. *See* Docket No. 41 (OSC). The Court also instructed Ms. Davis to address the merits of Defendants' motion to dismiss in her response to the order to show cause ("OSC").

3

1    Subsequently, the Court gave Ms. Davis additional time to file her response to the OSC.
2    *See* Docket No. 45 (order). Ms. Davis had indicated that she was looking to retain counsel. *See*
3    Docket No. 43 (letter).
4    On February 5 and 7, 2024, Ms. Davis, still proceeding pro se, filed several documents
5    with the Court. *See* Docket Nos. 49-50, 52 (filings made by Ms. Davis). In the filings, Ms. Davis
6    did not directly respond to Defendants' motion to dismiss other than reiterating that a
7    representative of ACG told her that her loan would be refinanced within 30 days of closing. She
8    provided, *e.g.*, some phone records suggesting that there were conversations between her and
9    ACG on or after June 28, 2022 (*i.e.*, the day of loan closing).

## II.    DISCUSSION

### A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.   Failure to State a Claim for Relief

Because Ms. Davis has essentially failed to address the merits of Defendants' motion to dismiss – even though the motion was filed approximately four months ago – dismissal of the majority of her claims is warranted.

The Court has also independently reviewed Ms. Davis's claims as pled in her FAC. This review confirms that her claims lack merit. Below the Court addresses the main claims asserted by Ms. Davis.[2]

1.   HBOR Claims (First and Second Causes of Action)

Ms. Davis asserts claims that her rights under the HBOR were violated. However, based on the allegations in the FAC, she lacks standing to bring any claims under the HBOR. Under California Civil Code § 2924.15(a), one does not have standing to bring HBOR claims unless (1) one lives in the property or (2) one is a landlord of the property *and* certain conditions related to the tenant and loan modification are met.

There is no dispute that Ms. Davis does not live in the property at issue. Therefore, she must rely on subsection (2) as a basis for standing. Ms. Davis claims she is a landlord and has a tenant who cannot pay rent because of COVID-19. But Ms. Davis ignores that § 2924.15(a) requires that the tenant have entered into a lease before or on March 4, 2020. Here, Ms. Davis did not take out her loan with ACG until June 2022. Therefore, it appears that the tenant did not sign a lease before or on March 4, 2020, as required in order for the statute to apply.

Even if Ms. Davis had standing to bring her HBOR claims, to be entitled to relief, she must show that the HBOR violation was material – how it made a difference. *See* Cal. Civ. Code §§ 2924.12, 2924.19 (referring to a "material violation"); *Morris v. JPMorgan Chase Bank, N.A.*, 78 Cal. App. 5th 279, 304-305 (2022) ("'A material violation is one that affected the borrower's loan obligations, disrupted the borrower's loan-modification process, or otherwise harmed the borrower.' Ultimately, at this stage of the analysis, we ask whether the alleged violation undermined the overall purpose of the HBOR."). Defendants fairly argue that Ms. Davis has

---

[2] In her FAC, Ms. Davis asserts fifteen causes of action.

5

failed to explain how any HBOR violation was material. *See, e.g.*, *Purganan v. Wells Fargo Bank N.A.*, No. 18-cv-03102-HSGa, 2019 U.S. Dist. LEXIS 102811, at *9-10 (N.D. Cal. June 19, 2019) ("[E]ven assuming that Defendant's action constituted impermissible dual tracking, Plaintiff does not plead how this violation is material. She merely alleges that she is now 'at risk of foreclosure,' and that 'Defendant's actions clearly interfered with the modification review process.' But Plaintiff does not explain how the dual tracking interfered with the review process: in other words, she does not contend that she was denied a loan modification to which she was entitled, or that the dual tracking affected her loan modification application in any way. Plaintiff does not dispute that she defaulted on her loan in October 2015 and that she would have undergone foreclosure proceedings regardless.").

2. <u>Fraud-Based Claims, Contract-Based Claims, and IIED Claim (Third Through Ninth Causes of Action)</u>

Ms. Davis's fraud-based claims (including negligent misrepresentation), contract-based claims (including breach of the implied covenant), and the IIED claim are all predicated on (1) ACG not telling her at the time of the loan that it was going to go out of business soon and that her loan would be sold and/or (2) ACG falsely promising her that she could refinance within 30 days with a lower interest rate.

These claims are problematic for similar reasons. (The Court puts aside Defendants' argument that the fraud-based claims fail to comply with Federal Rule of Civil Procedure 9(b).)

- The deed of trust expressly provided that ACG could sell the loan.[3] *See* RJN, Ex. 1 (Deed of Trust ¶ FF) ("The Note or a partial interest in the Note . . . may be sold one or more times without prior notice to Borrower. A sale may result in a change of the Loan Servicer. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given notice of the change.").

---

[3] It is also worth noting that P was arguably put on notice that her loan would be sold because she admits that, when she "got to the escrow table," she wrote a handwritten note stating that she would not live at the property "as long as I have a loan with Atlas Capital Group/The Rama Fund or any of its affiliates." Mot. at 8 & Ex. E (note).

6

- Ms. Davis got her loan from ACG in late June 2022 but, based on the allegations in the FAC, it does not appear that she ever sought to refinance within 30 days after getting the loan or even a few months thereafter. Without Ms. Davis seeking to refinance and getting denied, it is not clear how Ms. Davis can state a claim for false representation about refinancing.

3. <u>Claim for Cancellation of Instrument (Tenth Cause of Action)</u>

Ms. Davis's claim for cancellation of instrument relates to the assignment of the deed of trust (*i.e.*, from ACG to Rama). Ms. Davis has suggested that the assignment should be voided because the assignment was not made until April 2023, *see* RJN, Ex. 2 (assignment), at which time ACG had already dissolved (back in January 2023). *See* TRO Mot., Ex. M (certificate of dissolution for ACG, dated 1/4/2023).

This claim lacks merit for the reasons argued by Defendants. As an initial matter, ACG did not do the assignment. Rather, the assignment was made by MERS, acting as nominee for ACG. *See* RJN, Ex. 2 (assignment). The deed of trust conferred that status on MERS. *See* RJN, Ex. 1 (Deed of Trust ¶ A) (definitions). The deed of trust also states as follows with respect to MERS.

> MERS serves as mortgagee of record and secured party solely as nominee, in an administrative capacity, for Lender and its successors and assigns and only holds legal title to the interests granted, assigned, and transferred herein. All payments or deposits with respect to the Indebtedness shall be made to Lender, all advances under the Loan Documents shall be made by Lender, and all consents, approvals, or other determinations required or permitted of Lender herein shall be made by Lender. MERS shall at all times comply with the instructions of Lender and its successors and assigns. If necessary to comply with law or custom, MERS (for the benefit of Lender and its successors and assigns) may be directed by Lender to exercise any or all of those interests, including without limitation, the right to foreclose and sell the Mortgaged Property, and take any action required of Lender, including without limitation, a release, discharge or reconveyance of this Instrument.

RJN, Ex. 1 (Deed of Trust ¶ DDD.1); *see also* RJN, Ex. 1 (Deed of Trust ¶ IV) ("Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender

7

1    and Lender's successors and assigns) has the right: to exercise any or all of those interests,

2    including but not limited to, the right to foreclose and sell the Mortgaged Property; and to take any

3    action required of Lender including, but not limited to, releasing and canceling this Instrument.").

4            The fact that ACG as the lender had dissolved did not affect MERS's ability to take action.

5    Several courts have held such. *See, e.g.*, *Mortg. Elec. Registration Sys. v. Koeppel*, No. 5:18-cv-

6    03443-EJD, 2020 U.S. Dist. LEXIS 45252, at *26 (N.D. Cal. Mar. 13, 2020) ("Counter-Plaintiffs .

7    . . argue that, because CPM is a suspended corporation, MERS is incapacitated and is 'suspended

8    from acting' under the DOT. This is wrong – pursuant to California law, Counter-Defendant

9    MERS may still act as CPM's nominee or agent even though CPM went out of business. In other

10   words, CPM's dissolution has no bearing on MERS ability to act under the DOT."); *Freitas v.*

11   *Clear Recon Corp.*, No. C 18-03993 WHA, 2018 U.S. Dist. LEXIS 122943, at *7-8 (N.D. Cal.

12   July 23, 2018) ("[P]laintiff incorrectly asserts that the 2018 substitution of trustee, notice of

13   default, and notice of trustee's sale are all invalid because the original lender under the deed of

14   trust dissolved in November 2014. Contrary to plaintiff, the deed of trust expressly designated

15   MERS as the beneficiary and nominee not only for the 'Lender' but also for the 'Lender's

16   successors and assigns.' California law accordingly allowed MERS to act as the lender's nominee

17   or agent even after the original lender went out of business."); *Bryer v. U.S. Bank N.A.*, No. 15-cv-

18   00378-PSG, 2015 U.S. Dist. LEXIS 171702, at *5-6 (N.D. Cal. Dec. 22, 2015) ("California law

19   allowed MERS to assign the deed of trust even after First Magnus went out of business. *Herrera*

20   *v. Federal National Mortgage Ass'n* is directly apposite. In that case, the lender named on the

21   plaintiffs' deed of trust had dissolved, but the California Court of Appeal held that MERS

22   nevertheless had the right to assign the deed of trust. And, contrary to Bryer's assertion, the

23   *Herrera* court explicitly rejected plaintiffs' argument that 'MERS lacked authority to assign the

24   [deed of trust].' Here, as in Herrera, the deed of trust specifically granted MERS the right 'to

25   exercise any or all of' the lender's interests. This included the authority to assign the note. As a

26   matter of law, the assignment was valid.")[4]; *Ghuman v. Wells Fargo Bank, N.A.*, 989 F. Supp. 2d

27

28   [4] *Herrera v. Federal National Mortgage Association*, 205 Cal. App. 4th 1495 (2012), was overruled in part by the California Supreme Court. *See Yvanova v. New Century Mortgage Corp.*,

1   994, 1002-03 (E.D. Cal. 2013) ("Plaintiffs have provided no authority and the Court's research
2   reveals no authority to suggest this power [of MERS to act as nominee of the lender] is affected
3   when a lender becomes defunct"; "[t]hus, in our present case, because the power of MERS as
4   nominee under the Deed of Trust was not impaired in any way by the Lender becoming defunct,
5   there is no basis upon which the subsequent assignment of the Deed of Trust to Deutsche Bank
6   can be found invalid."); *see also Kiah v. Aurora Loan Servs., LLC*, No. 10-40161-FDS, 2010 U.S.
7   Dist. LEXIS 121252, at *12 (D. Mass. March 4, 2011) ("The plain language of the mortgage states
8   that MERS was acting as nominee for First Magnus and its 'successors and assigns.' First Magnus'
9   dissolution would not prevent its successors and assigns, including Aurora, from seeking transfer
10  of the mortgage from MERS. [¶] Accordingly, the dissolution of First Magnus would not and
11  could not prevent Aurora from obtaining an assignment of the mortgage from MERS, both as a
12  matter of law and according to the arrangement that existed between MERS and Aurora as a
13  'successor and assign' of First Magnus."). In short, there is no viable claim based on MERS's role.

### 4. Federal Claims (Eleventh and Twelfth Causes of Action)

In the FAC, Ms. Davis asserts two federal claims: (1) in Count 11, a violation of Regulation Z by ACG and Rama; and (2) in Count 12, a violation of Regulation C by ACG and Rama. For Count 11, Ms. Davis alleges that these Defendants violated Regulation Z by assigning the deed of trust because ACG had already dissolved. *See* FAC ¶ 98(a). For Count 12, Ms. Davis alleges that these Defendants violated Regulation C by failing to collect and report data about their closed-end mortgage loans. *See* FAC ¶ 100.

---

62 Cal. 4th 919, 939 n.13 (2016) ("We disapprove *Jenkins v. JPMorgan Chase Bank, N.A.*, *supra*, 216 Cal. App. 4th 497, *Siliga v. Mortgage Electronic Registration Systems, Inc.*, *supra*, 219 Cal.App.4th 75, *Herrera v. Federal National Mortgage Assn.*, *supra*, 205 Cal.App.4th 1495 and *Fontenot v. Wells Fargo Bank, N.A.*, *supra*, 198 Cal.App.4th 256, to the extent they held borrowers lack standing to challenge an assignment of the deed of trust as void."); *see also id.* at 923 ("The Court of Appeal held plaintiff . . . could not state a cause of action for wrongful foreclosure based on an allegedly void assignment because she lacked standing to assert defects in the assignment, to which she was not a party. We conclude, to the contrary, that because in a nonjudicial foreclosure only the original beneficiary of a deed of trust or its assignee or agent may direct the trustee to sell the property, an allegation that the assignment was void, and not merely voidable at the behest of the parties to the assignment, will support an action for wrongful foreclosure.").

As Defendants argue, both Count 11 and Count 12 are problematic.

For Count 11, Regulation Z is rooted in the Truth in Lending Act. *See Zevon v. Dep't Stores Nat'l Bank*, No. 11812-VCG, 2013 U.S. Dist. LEXIS 157784, at *2 (S.D.N.Y. Nov. 4, 2013) ("TILA promotes consumers' 'informed use of credit' by requiring that creditors provide 'meaningful disclosure of credit terms.'  TILA authorizes the Consumer Financial Protection Bureau ('CFPB') to issue regulations to achieve TILA's purpose of promoting meaningful disclosure. . . . . The regulation promulgated to enforce TILA is known as Regulation Z."). Defendants' argument that TILA does not apply because no consumer transaction is at issue, *see* Mot. at 14 (arguing that "the loan transaction at issue in this lawsuit was for business purposes, and TILA covers transactions "'primarily for personal, family, or household purposes'") appears to have merit.[5]  In any event, Count 11 lacks merit because, as discussed above, there was nothing legally wrong with MERS assigning the deed of trust after ACG had dissolved.

For Count 12, Regulation C is rooted in the Home Mortgage Disclosure Act. *See* 12 C.F.R. part 1003.  The purpose of Regulation C is stated as follows:

> This part implements the Home Mortgage Disclosure Act, which is intended to provide the public with loan data that can be used:
>
> (i) To help determine whether financial institutions are serving the housing needs of their communities;
>
> (ii) To assist public officials in distributing public-sector investment so as to attract private investment to areas where it is needed; and
>
> (iii) To assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes.

*Id.* § 1003.1(b)(1); *see also* 12 U.S.C. § 2801(b).  Regulation C does require some compilation of data and annual reporting by financial institutions.  *See* 12 C.F.R. §§ 1003.4 to -.5.  The regulation also provides: "A violation of the Act or this part is subject to administrative sanctions as provided in section 305 of the Act (12 U.S.C. 2804), including the imposition of civil money penalties,

---

[5] *See also* 15 U.S.C. § 1602(i) ("The adjective 'consumer,' used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.").

10

where applicable. Compliance is enforced by the agencies listed in section 305 of the Act." *Id.* § 1003.6; *see also* 12 U.S.C. § 2804(d) (addressing enforcement authority). The claim under Regulation C lacks merit because there is nothing to indicate that the regulation provides for a private right of action – *i.e.*, it does not provide the basis for a private person to sue.

C. Amendment

For the reasons stated above, the Court dismisses the claims asserted in the FAC. However, the Court shall give Ms. Davis leave to amend – specifically, so that she may plead the fraud claim that was never precisely pled in her FAC:

> that she was initially promised an interest rate of 8.75% . . . but that, when she went to sign the loan, the interest rate was significantly higher – *i.e.*, 10.875% . . . [and] that, when she brought this to the attention of Defendants, they essentially promised that they would fix the problem by refinancing her loan "in house" at the lower rate so long as she signed the loan that day.

Docket No. 21 (Order at 20). The Court acknowledges that it denied Ms. Davis preliminary injunctive relief based on this fraud claim. However, that Ms. Davis is not entitled to preliminary injunctive relief on the claim does not mean that Ms. Davis cannot ultimately prevail (in whole or in part) on the claim. While it is skeptical, the Court cannot conclude that any attempt to amend the complaint would be futile.

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss the FAC but gives Ms. Davis leave to amend. Ms. Davis has until March 28, 2024, to file a second amended complaint ("SAC") to plead the fraud theory identified above. This is the only amendment that the Court is permitting at this time. Defendants shall then have until April 25, 2024, to file a response to the SAC (whether an answer or a motion). If no SAC is timely filed, then the Clerk of the Court shall automatically dismiss this case with prejudice.

///

///

///

///

To the extent Ms. Davis has asked the Court to reconsider its denial of her motion for a preliminary injunction, the request is denied. Ms. Davis has failed to show that she meets the prerequisites for a motion to reconsider. *See* Civ. L.R. 7-9(b).

This order disposes of Docket No. 6.

**IT IS SO ORDERED**.

Dated: February 29, 2024

_____
EDWARD M. CHEN
United States District Judge

12